All right, so we'll continue on with this morning's arguments and call case number 18-20394, Tow v. Organo Gold. Ms. Moulton. Good morning. May it please the Court, my name is Cindy Moulton and I'm here on behalf of Holton Buggs. Mr. Buggs is here this morning at Council table. I'm joined by Seth Nikomoff and Jamie King, who are representing the Organo defendants. Mr. Nikomoff will address the standing issue and any issues unique to the Organo defendants. I will do my best to address the remaining issues. Euphemistically, Your Honors, this is a list of all Merrill Lynch brokers within the Fifth Circuit. Their names, addresses, email addresses, telephone numbers, assets under management, production. This, Your Honors, is a notebook of contracts signed by each of those brokers, euphemistically, agreeing to transfer to a new firm and bring their assets and their books of business with them. Worth millions. Millions. Not even close. Not even close. The problem with the trustees' case, Your Honors, is that they presented one case on liability and a different case on damages. The liability case was premised upon the transfer of a distributor list, but the damages case was premised on the transfer of a distributor network. You have some handouts here, you should, I believe, before you, Your Honors. And I'm looking at the two-page handout. The trustees' expert was very clear about what he valued in the case. He valued the distributor network. I was hired to determine the value of the distributor network, he says. I concluded the value of the distributor network was $3.5 million approximately. I was hired to value the distributor network. I was sitting in this morning, he says, and we talked a lot about these lists of people, the genealogy, all their information. All of that is part of the network. So that's part of what I valued, but it goes beyond just a list. It really relates to the relationships between the distributors, the fact that they're working with each other and sometimes for each other. It has to do with the relationship between the distributors and the company they work for. And ultimately you have this group of people that as an asset, if you think of them as that whole network as an asset, are able to generate revenue for the company. What we were doing is valuation of the network. Recognizing the lapse between the value of the list, their liability claim, and the value of the network, their damages evidence, what the trustee attempts to do in its briefing before this court is convince the court that the list and the network are the same. It doesn't work. It doesn't work. There is not legally sufficient evidence of damages because the list and the network simply are not the same. They are two entirely different things with different values. Let's assume that you likely contest that there was misappropriation of a trade secret to begin with, or do you? To the extent the list was proven to be a trade secret, Your Honor, it can be misappropriated, the list itself. Okay. So you say there's a mismatch between liability, which would be misappropriation of the list, right, and damages, which you say were measured in terms of the network. Yes, Your Honor. Okay. So how would there be a misappropriation of the network then in your view? Your Honor, they didn't present their case based on a violation or a transfer of the network itself, but they could have. I don't know. How could they have done that? Your view seems to be that the list and the network are distinct concepts. Certainly. And I understand that in the abstract. How could they have proved that there was a misappropriation of the network aside from showing a misappropriation of the list and all the confidential information? I'll do my best, Your Honor. Had the facts supported it, for example, they could have brought a breach of fiduciary duty claim or an unfair competition claim, and they could have alleged that when Mr. Koshue talked to Mr. Buggs and introduced his top-level distributors to Mr. Buggs, that what he was doing in effect was transferring the network to Mr. Buggs. They could have gone and talked to their distributors. They could have gone and reached agreements with those distributors to enter into contracts with Organo. They could have had Mr. Buggs meet with those top-level distributors and said, Look, these are the guys. These are the top guys. They control this network. And now, rather than working for AmeriSciences, you're going to work for Organo. And they could have gotten commitments from those people to move over to Organo. That's one way they could have done it. And if they had done that and they argued that there was a decimation of the network, they could have presented a different damages model on different theories of liability. They could have still had a breach of fiduciary duty theory of liability. They could have had an unfair competition theory of liability. They could have had a tortious insurance theory of liability. And that damages model may have suited that liability claim and those facts. That's not what they did. Another way they could have done that is Mr. Koshue might have gone to Mr. Buggs or to Organo and said, We want to enter into a merger agreement, or we want to enter into an acquisition. That may have been a breach of fiduciary duty. That may not have been approved by the company. That may not have been something that he was legally able to do. There may have been a cause of action arising from that. But in that event, what would have transferred is this asset, Your Honor, this asset, not this. And the case wasn't tried that way, and the case wasn't submitted that way. The case was submitted to the jury, and if you look at the second handout, which is the three-page handout, what the court charged the jury and what the questions to the jury asked was for trade secret misappropriation. The trustee plaintiff alleges defendants engaged in misappropriation of the alleged trade secret of the Amerisciences distributor list. The measure of damages, the remedy for that cause of action, is not the value of the network. It's the value of the list. It's what was lost or the out-of-pocket costs, a reasonable royalty, the value that was gained. It's not the value of the network. Breach of fiduciary duty. The breach of fiduciary duty claim was premised on Koshue's breach of his fiduciary duty, committing defalcation by misappropriating the Amerisciences distributor list. The list, not the network. Unjust enrichment. The court told the jury that the plaintiff alleged they were unjustly enriched by receiving the Amerisciences distributor list. The defendants got a copy of the list. Not only that, Your Honors, Amerisciences retained a copy of the list. What they lost, if anything, was exclusive use of the list. Exclusive use. They kept it. That's important in the fraudulent transfer claim, and I'll come back to that in a moment. The evidence of what defendants gained, the only evidence in the record, is the defendants profited in the amount of approximately $57,000. That's the record evidence of the value to the defendants of the list. Unjust enrichment, fraudulent transfer, the same thing. The fraudulent transfer claim fails for other reasons, but the court charged the jury that trustee alleged that defendant Koshue fraudulently transferred the Amerisciences distributor list. The list. The damages for that are the value of the property transferred. Often, Your Honors, damages, awards, don't make sense, and that's a benchmark for excessiveness. It's often common sense. The numbers don't make sense. Koshue was paid $250,000, $300,000, in part to provide the list. The trustee sold product inventory. After the case was over, the trustee sold product inventory, general intangibles, and intellectual property to Supplement Research for $150,000.  He individually didn't own the list, so I thought it's like selling the Brooklyn, the quick claim to the Brooklyn Bridge. I'll take $300,000 for that. Sure. But what they could have said to him, he could have said, I'll bring my network over. I'll bring you something more valuable. There's still a value associated with it. That's a breach of his fiduciary. But they did end up taking some of the list and making it a network. $454,000 out of it. Well, that's always going to – I mean, you can't force – I don't even understand your argument that you can force the people. So then you're saying you never could prove the network's theft. Sure, they could have. Not theft. That would have to be a different cause of action, as Judge Duncan asked. So breach of fiduciary duty, certainly. An unfair competition claim, certainly. Tortious interference claim. But the damages model would have had to have met that theory of liability. That's not the case they put on. The value – in bankruptcy, the trustees sold the product inventory, general intangibles, and intellectual property to Supplement Research for $150,000. Organo's profits from use of the list was $57,000. The trustees settled with Giardo and the other major distributors for $110,000. Nowhere in the case is a number approaching $1 million, much less $3.5 million. Okay. You have reserved time for a vote. I have, Your Honor. Thank you. And you've registered. Nickham off. Nickham off, Your Honor. May it please the Court. You know, the – I think what is central to this case is the concept of ownership. And that goes to standing, and that goes to this 363 sale order. Under the 363 sale order, the trustee sold everything that the estate owned. That's not an Article III standing argument. Right. So you had to have made it. But when that was – so – I know. Almost there. So when the – what was owned were the causes of action and the trade secrets. So for the trustee to later then sue for the same causes of actions and the things that were owned and sold by the trustee, the trustee can't sell it and then turn around and sue on it. That's what happened here. The 363 – That's a real party and interest argument. That's not a standing – Article III standing argument. Well – As well, it's not a contract you can challenge, the contract between them and who they sold it to. So if they're saying they're going to reform that or revise it in some way, there's not a whole lot you can do about it. So how is that something we should consider in the absence of a proper motion? Because we're dealing with an order under Uvino, which was a bankruptcy, of course, admittedly, but then in the Supreme Court of Travelers v. Bailey. In those cases, the court order is not a private contract. It's a public order. And this is not only a court order. This is a court order to which defendants could have objected to that they were actually parties to because the court order was entered in an action to which the defendants – Did you need to have raised this point in a Rule 50 motion? I'm sorry? We – the Rule 50 motion. No, Your Honor, because it would be – because it was raised on a 12B6 motion initially, and it was raised again in a motion for summary judgment. Our predecessor counsel, Baker Botts, made a motion under 12B6 saying you lack – you don't own the claim. I don't think that's good enough when you go to trial. Well, Your Honor, because we're dealing with an unambiguous court order and we're seeking enforcement of it, not only a court order, but a court order entered in basically the same action because it was entered in a bankruptcy action, and this is ancillary too. So it's not – we're not talking about a contract that we're seeking to enforce against another party. We're talking about an order by the Southern District of Texas. Okay, but I don't know that that changes Rule 50. That requires that everything except, you know, subject matter jurisdictional type things like Article III standing, which we don't have that here, have to be raised in a Rule 50 motion. I think to answer your question about Rule 50, I said before it wasn't answered. I think, in fact, it was made, the objection, because it was stated – because it was orally argued – when the oral objection was made, we stated that the trustee did not own the claims. So that would have been part of that Rule 50 motion. Okay, where is that? I'll have to find you the site specific to that, but during the – that was part of our – but I'll have to get you that site. I only have a brief time. On the jury questions that were submitted, Your Honor, the problem is that fraudulent transfer was inferred as a matter of law against defendants after the jury verdict. The jury question as to whether or not organo defendants received the property was never asked. And that's important because 11 U.S.C. 550 says that we have to – that the judgment can be against the initial transferee or the mediate or signee. This Court itself has actually certified to the Texas Supreme Court a Tufta case in Janvey v. GMAG about whether or not, you know, defenses you could have a Tufta claim. That was one of the things that we didn't have the opportunity to do because the jury question that we asked for, which was on transferees, wasn't presented. We submitted questions such as whether we were mediate transferees, initial transferees, subsequent transferees. All these are relevant issues that give rise to various defenses. We didn't have that opportunity because there was never a question submitted to the – we asked for those and we objected, but there was never submitted to the jury a question as to whether or not the organo defendants were transferees and transferred – received or what they received. In fact, Mr. Tao's own jury questions and own discussion with the judge was that, I think we need these questions. Without those questions, you're left with an absolute conundrum and a material issue before the Court as to what was received.  Mr. Buggs as well, and we believe that there is no standing because the trustee did not own it by virtue of court order. Okay. I was going to say that looks like a stray notebook there. Mr. Hogan. May it please the Court. As we appreciate it, Your Honors, the overarching question of whether the trustee may avoid a transfer for which the debtor received no benefit and for which the two principals of the company received the only benefit, we suggest to the Court the answer is yes, the trustee may avoid this fraudulent transfer. But that doesn't get you $3 million. Your Honor, the methodology of damages is straightforward in this case. It's supported by the AICPA standards, the Statement on Standards for Valuation Services, subpoint number one under that, and the expert testified about that. Does the list have value if it doesn't translate into actual customers, clients, or whatever you want to call them? It does, Your Honor, and you have to give me just a moment to explain what this list is because as I understand the argument here, there's a legal rendition argument being made out of a semantic game between a distinction of list versus network. And that semantic game doesn't hold water when you look at what the list is. What is the list? And this is all framed, Your Honor, the question is of the damages, what the list is under a misappropriation of trade secret claim in Texas under Texas law. This Court's opinion in Wellogix says that the plaintiffs are entitled to adapt their damages theory to fit within the particular facts of the case. That's a 2013 Fifth Circuit case. The Texas Supreme Court follows that in the Southwest Energy Production case, which says that damages must be flexible and an imaginative approach. Following this Court's opinion in 1974 in the University Computing case, which says each case is controlled by its own peculiar facts and circumstances. And in this case, those facts and circumstances, which are peculiar to the list, ask this Court to look at what the list consists of. If you look at the list in terms of the time spent on it, the size and scope of it, the compensation that follows from it, and the cost that was incurred in preparing that list, you have not just a list but also a network. And that's our position. This, Your Honor, the record. Mr. Hogan, with respect to the cost of compiling the list, did the expert, I guess your side's expert, value that? What was the value, $6.something million? Is that it? The inflation adjusted value was $6.2 million, yes. That's sort of an understanding of how much it cost to compile the $6,400. Correct. But then as I understand it, there was another valuation that is, I see it as distinct, maybe I'm wrong, that talked about the amount of profit that one could realize from having the list. Is that right? It was an income approach. An income approach. So that was something like $700,000. That's right. So I understand that Texas allows a flexible and imaginative approach to damages. In this one, is the idea that you have these two distinct valuations and you just allow us to average the two? Yes, Your Honor. That's absolutely right. Under the Statement of Standards on Valuation Services, which the AICPA puts out, and to which Mr. Weingast, who's the expert, testified to in his affidavit to this blending of the income and the cost approaches, which is at page 886 of the record. Under the AICPA standards, paragraph 42 says that the expert, quote, should correlate and reconcile the results obtained under the different approaches and methods used and that the evaluator person must, quote, determine whether the conclusion of value should reflect, one, the results of one valuation, or two, a combination of the results of more than one valuation approach and method. And in this case, if you look at just the cost alone that was put into preparing this list, which is contradistincted to a network under their argument, it's $6.2 million. The jury award is 3.4 plus. Now, time. Look at how much time was spent on this list. The testimony at page 1512 of the record, and this is from Mr. Redman, who's the chief operating officer of Amira Sciences. Ms. Moulton would say you're still ignoring the difference between the list and the network, that the time was spent developing the network.  by listing every business in New Orleans, but until I've actually had contact with them, they're interested in hiring me as a lawyer, so on and so forth, I don't really have a network. But, Judge Haynes, what if you added to your list the Social Security information, the 1099 information, who the customers are associated with in terms of that distributor? If you also added the genealogy that's associated with the downstream content of the list as to the distributors reaching out to all these people. So you're saying it's the information on the list, not just the name and address. Yes, and tellingly, their position in this court is directly at odds to what the Organo Gold Party told a court in Washington, and this is cited at page 4260, I believe, of the record on appeal in a case called Organo Gold v. Ventura, which is a case in Washington. The court in that case said, among Organo Gold's most valuable assets is its sales organization, including contact information and customer data within the sales organization. That's what they told a court on the left coast. And in this situation, Judge, there is absolutely no distinction between what our position was here and what their position was in Washington. There's much more crammed into this list than anything else. So this is like the old days when we'd have a little index card box, and on the index card you'd have details about the client so that you could interact with the client more pleasantly in a way that would make them feel valued. That's right, the Rolodex. I mean, your Rolodex, and this is in Mr. Weingast's, or I'm sorry, Mr. Redman's deposition that was used in response to a motion for summary judgment in the case. It didn't make it into the trial testimony, but he said the Rolodex is the most valuable thing that the company had. So if you look at the time, the size, and the scope of the list, what it consists of, if you look at the fact that the compensation of all of these distributors is derived precisely from this list, the income allocation agreement that AmeriScience has used at page 8802 of the record, the policy and procedure manual at page 8806 of the record, and in fact OrganoGold's own compensation program, which is at pages 8860 and following of the record, all show that the compensation system for the distributors is built off this list. And in fact, those documents refer not to a network, but to a, quote, customer lists that are protected as trade secrets. So, your Honor, this distinction semantically between list and network doesn't lead anywhere when the court looks at what the list consists of precisely. Let me address this issue of standing. And, Judge Haynes, I think you've put your finger precisely on it. This is not an Article III constitutional or jurisdictional standing point. The term standing here is used informally as to whether somebody can challenge a contract or a court order. And I want to give the court the case that I've found since the briefing. We didn't write the briefs, but in preparing for argument, there's a case out of the Central District of California, which is in the context of a Section 363. Did you revise the opposing counsel of this case? I don't. I have not provided it in sight, Judge. I found it last night, but I'll write a 28-J letter today and give it to them. I don't like that when lawyers do that. It's very unfair to the other side. I should have, Judge. You're right, and I apologize. But this case is DBD Credit v. Silicon Labs. It construes this standing argument in the context of a sales order and says that strangers to the contract and strangers to the sale order cannot move to enforce that order. What's the site? I didn't write it down on my notes, Your Honor. Okay. I'll get it to you. So I guess you're not just keeping it from your opponent. You're also keeping it from us. I'm sorry. I'm going to try again. That's a new one. All right. Go ahead. It's a district court, not a bankruptcy court opinion, Judge. I've got the site in my other notes, and I apologize. What's the bottom line that you're trying to make? We're obviously not bound by the Central District of California. So what's the bottom line point you're trying to make? But I think the rationale is compelling, nonetheless, and persuasive to the court in that that 363 sale order, in terms of standing, basically says the point that you were making, Judge, which is that a stranger to a contract and a sales order cannot enforce that as with regard to somebody who's a party and governed by the order. And in this case ---- What about the Rule 50 point? Did they make the argument under Rule 50? No, Your Honor, they did not. There's no argument made either at the charge conference and in objecting to any Section 548 or 550 question being missing. There's no objection to that at the charge conference. There's nothing in the Rule 50. The charge conference isn't where you make a Rule 50. No. I'm just suggesting there are other procedural contexts where they also failed to raise that point. And it's not in their Rule 50 argument. And so to that extent, you know, I think it has been waived. It's something that should have been raised at trial. Judge Gilmour was never given the chance to pass on that issue. And so there is no standing to argue this now. And in any event, even if there were standing, if it had been raised, if they had made this argument to the trial judge, the Chapter 5 Bankruptcy Code claims are carved out. And so that Section 548 and 550 would have been available to grant a motion to alter judgment on, which the judge did in this case. You have to remember what happened here is that the verdict was returned on May 15th. On May 16th, without any motions or input from the parties, the judge signed a judgment. And the judgment, the idea had been, I believe, correctly strategized by our side, that if you have both common law fraudulent conveyance claims and you have statutory law fraudulent conveyance claims in the same jury charge, it raises the potential for conflict. But if you have all the elements that are necessary to formulate a Section 548 or a Section 550 judgment from, and you've got all those answers from the jury, and you know in the joint pretrial order that Mr. Koshue's status as an agent of the AmeriSciences debtor is stated as a stipulation in subpart F of the pretrial order on page 3143, then you know that the jury has told you everything you need to know to formulate a judgment based on Section 548 and 550. And there's no difference really here between doing that, which Judge Gilmour did, and doing something like in an antitrust case or in a case in which injunctive relief would be available. And you get jury answers, and then the judge formulates the basis of the relief and the relief based on those and adds an injunction later in a case. Nothing shocking about that. So the judge can grant those kinds of motions, and this court has said in Benson v. St. Joe's, I'm sorry, I do have the slide for this, which is 575 Fed 3rd at page 548. Judge Southwick in 2009 deemed that a Rule 59 approach to legal error by a court, quote, is a readily available procedure by which a party may seek reconsideration by a court of a number of matters, including legal errors made by the court. So Judge Southwick and this court have spoken on the issue of whether Rule 59 is a proper procedural vehicle for doing what happened here, and that is extending the relief to include bankruptcy code relief, which was carved out of the order of sale and which permits the court to do what it does in this case, which is avoid this fraudulent transfer, which we believe is properly valued. And if I can use some of the six minutes I still have, I'll go get that site, Judge, right now if you need me to. Yes, it's your six minutes. It's odd to me because when I was a lawyer, I didn't wait until the day before a hearing in a court or an oral argument or any such thing to do the research. So it's kind of odd to me how many people show up with new cases that they found the night before, because the night before I was just figuring out what I was going to say. Maybe I was an unusual lawyer. No, Your Honor, you're doing it the right way. And all I can do is apologize to the court and tell you that I was recently hired in the case and was doing the research and came across this case, which I found very compelling. Well, I will say that if you do that, you should at a minimum tell the opposing counsel as soon as you see them or e-mail them or text them or whatever the current version of contacting opposing counsel is. On Twitter. Yeah. Snapchat them. Instagram. If I knew how to use those, Your Honor. I obviously don't because I have no idea how to do Snapchat. That's not the way to communicate with opposing counsel. And I'll give a 28-J letter on this so it's in the record, too, for the court. This is DND credit funding versus Silicon Labs, which is out of the Central District of California in 2017. It's 2017 Westlaw 415-0344. And it says that outside the context of Rule 7071 of the bankruptcy rules, the non-party cannot enforce or enjoin a sale on a contract or an order approving the sale. And that's essentially the same kind of context we have here. They're not allowed to argue that we can't use the contract of sale or that it somehow bars our standing. So those are the arguments we have from the court. Mr. Hogan, back to damages. To the extent, as I understand the other side, is making an evidentiary argument that the damages calculation are not supported by evidence. I assume they're making that argument. Is it a problem for your side that we have a $3.4 million jury finding on damages, and yet it seems like when this list or network was misappropriated, it looks like they realized $50-something thousand worth of profit. Is that right? Is that a problem? Does that suggest that the damages are not supported by any evidence? No, Your Honor. We don't think it is a problem. The problem here is, if anything, in terms of what you asked, which is, is there a proper methodology followed? And under CUMO-TIER, under an abuse of discretion standard, that's for the district court to determine whether there's going to be an adequate methodology applied. And because it follows the AICPA, because it's based on a weighted adjustment between cost and income approaches, and because Texas allows a flexible and imaginative approach that must fit the particular facts of the case, the lower amount than the cost to establish that distributor list and network is compensable as a fraudulent transfer. It is for the jury to decide ultimately, based on that reliable methodology, and for this court to defer as it should to the jury's finding of damages. The jury, is it right to say that the jury essentially followed the recommendation of your expert on damages? To the penny, Your Honor, yes. Absolutely. And there was a competing expert on damages who suggested a different methodology? There was a criticism by that expert of our expert, which was voiced to the parties that needed to decide that issue, and they bought our expert's testimony. So it's clearly a question of deference, not only to the judge's reliability determination, but to the jury's factual determination of damages. And unless there are any other questions, I'll give back to the court. Thank you. Appreciate it. I'll work backwards. Judge Duncan, our expert did put on evidence. It's not a question of methodology. It's a question of did he value the list, or did he value the network? He valued the list. And he found that . . . Counsel, all these arguments about whether or not the jury should have given weight to their expert versus your expert, you made those arguments at trial. We did, and there was a doubt . . . Before the jury. They were made before the jury, in the presence of the jury. The list versus the network, Your Honor? Uh-huh. There was evidence, yes, put on as to the value of the list, and the value of the list was between $55,000 and $394,000, according to our expert. I'm just saying, did you argue this point to the jury? Did you say, okay, I mean, they talked about this network, but that isn't what they've asked you. May I? Go ahead. Did you? Yes, we did. But we were also prevented from presenting lost profits testimony. That's true. They were prevented from presenting lost profits testimony. The trustee objected. Look, Your Honors, I can't crash into your Toyota, or you can't crash into mine, and have an expert come in and put on the value of a Bentley. It doesn't work that way. It doesn't work that way. And there's a difference between a Bentley and a Toyota. There's a difference between a list and a network. But I think the average person knows the difference between a Bentley and a Toyota, whereas testimony needs to be given on whether there is a difference between a list and network, and if so, what it is. And then that's something the jury has to look at. Sure. Absolutely, Your Honor. And that's a problem with the way the case was submitted. That's a problem with the court's failure to affirm the Daubert motion. That's a problem with the judge's submission of a single damages question, a single line for the five different causes of action. Well, on the damages amount, I mean, are you appealing the denial of your Daubert motion with respect to their expert, or are you using an evidentiary issue with respect to the amount of damages? Both, Your Honor. I mean, we do challenge the denial of the Daubert motion, and that's in our briefing. But the problem with the case, the problem with the case, and the reason that there's no legally sufficient evidence of the value of the distributor list, which is what the jury was asked to value, that's what they were asked in every question. Interference with the distributor list. Okay. Misappropriation of the distributor list. That's what they were asked. The evidence, the only evidence that the trustee would put on was the value of the network, the Bentley. And as I said, Mr. Buggs and Mr. Koshue could have. They could have gone in a back room. They could have made a list of every one of the top producers in the network. They could have had each of those top producers contact their downlines. They could have gotten commitments from those people to move from AmeriSciences to Organa. They could have done that. They could have decimated the network. And in that case, it may have been proper to put on expert testimony of the value of the network. But they submitted a trade secret misappropriation and fraudulent transfer of a list case. A trade secret, Your Honor. What's a trade secret? It's a compilation of data, a formula, a pattern, a device. It's not people. It's not a business. It's not the culture. And in terms of the value that it took to build this network, everything that you heard from Mr. Hogan is the value of the network. You know what they spent that six and a half million dollars on or some large portion of it? They bought cars for those distributors. They took them on trips. They gave them perks. They bought them dinners. That's what you do when you build a network. You build a network. You entice people to work with you. You entice people to work for you. The people, then those people, build their businesses. And the value of that network is the value of the businesses built by those people. The list has value, no doubt. I'm not here telling you there is no value in the list. I am telling you that the value in the list is different from the value of the network. And the only evidence, the only evidence that they put on and the evidence that the jury relied on was evidence of the value of the network. Can you value the list? Of course. Can you find a good recruiter? If you give them a list of names of brokers at Merrill Lynch, you can call those people up and entice them to move over? You can. Is that the same as saying that if I go into the Merrill Lynch office and value the book of business of every broker in the office, that that's the value of the list? No way. No way. What's your best precedent for drawing that distinction in a trade secrets case? Actually, I think that the Globe Ranger case is instructive. This is a Judge Graves' opinion. It's a trade secret case. That's a Texas case. That's the one that talks about flexible and imaginative. It's a Fifth Circuit case. Oh, I'm sorry. You're right. It cites the Texas case. Sorry. Go ahead. That's okay. No problem. It's a trade secret case. It's a misappropriation case. There was some data misappropriated relating to naval contracts. And it was a large value as well, but the value of the data that was misappropriated was the value. They could have said, you took the contracts. You took the relationships with the Navy. You took everything that we make our profits off of, and that has a different value. Okay. So that's your best case? That's the one that's coming to mind. Okay. Do they get a letter? Maybe I'll get a letter, Your Honor. Well, something to keep in mind is that 28J is intended to cover cases that come out after briefing, not cases you or your predecessor should have found had you done thorough research. So I do think you should write a letter saying this is the case that we cited in court. That doesn't mean we will consider it. Obviously, if it was precedential, we'd have to, whether you told us about it or not. But it's not precedential. But I think since you brought it up, I think you have to tell us about it. Thank you, Your Honor. We rely on our briefing and the distinction between the list and the network. Thank you very much. Your Honor, you wanted us to cite the rule 15. We believe we challenge all the elements. I can write a letter to the court with, if you want, telling you where we challenge it. But we believe we challenge the elements from Rule 15. All right. Here's what I'm going to do. I'm going to give each side a one-page letter. Say what you're going to say. Thank you, Your Honor. Thank you. And that's it. Filed by tomorrow evening, tomorrow by 5. Thank you, Your Honor. Thank you, Your Honor.